**BARROWAY TOPAZ KESSLER**
  **MELTZER & CHECK, LLP**
ERIC L. ZAGAR (250519)
LOUIS MOYA
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (267) 948-2512
ezagar@btkmc.com
lmoya@btkmc.com

-and-

RAMZI ABADOU (222567)
ERIK D. PETERSON (257098)
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Fax: (415) 400-3001

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCHELL NORRIS, Derivatively on Behalf of ALPHATEC HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MORTIMER BERKOWITZ, III, JOHN H. FOSTER, R. IAN MOLSON, STEPHEN E. O'NEIL, STEPHEN H. HOCHSCHULER, JAMES R. GLYNN, ROHIT M. DESAI, DIRK KUYPER, SIRI S. MARSHALL, PETER C. WULFF, HEALTHPOINTCAPITAL, LLC, HEALTHPOINTCAPITAL PARTNERS, LP, and HEALTHPOINTCAPITAL PARTNERS II, LP, <br><br> Defendants, <br><br> -and- <br><br> ALPHATEC HOLDINGS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. **'10CV2477 LAB POR** <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. _____

1      Plaintiff Marchell Norris ("Plaintiff"), by the undersigned attorneys, submits this Verified

2   Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and

3   alleges upon personal knowledge with respect to himself, and upon information and belief based

4   upon, *inter alia*, a review of public filings, press releases and reports, and an investigation

5   undertaken by Plaintiff's counsel, as to all other allegations herein, as follows.

6                 **NATURE AND SUMMARY OF THE ACTION**

7      1.     This is a shareholder's derivative action brought for the benefit of nominal

8   defendant Alphatec Holdings, Inc. ("Alphatec" or the "Company") against certain executive

9   officers and members of its Board of Directors (the "Board"), referred to herein collectively as

10   "Individual Defendants" (as defined below), as well as certain other related entities, seeking to

11   remedy defendants' breaches of fiduciary duties, unjust enrichment, filing of false proxy statements

12   in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)," or "§14(a)"),

13   and other violations of law that have caused the Company to sustain damages.  The action arises

14   from the conduct of the Individual Defendants and the Company's controlling shareholder to

15   unreasonably cause the Company to acquire Scient'x, S.A. ("Scient'x") against the Company's

16   best interests, to issue false and misleading statements, and to unfairly and unjustly receive millions

17   in proceeds from a public stock offering.

18      2.     Nominal Defendant Alphatec, through its wholly owned subsidiary, Alphatec Spine,

19   Inc., engages in the design, development, manufacture, and marketing of products for the surgical

20   treatment of spine disorders, focusing primarily on the aging spine.  As a publicly traded company

21   whose common stock was, and is, registered with the U.S. Securities and Exchange Commission

22   ("SEC") pursuant to the Exchange Act, and was, and is, traded on the NASDAQ Global Market

23   ("NASDAQ") under the ticker symbol "ATEC", and governed by federal securities laws, Alphatec

24   had a duty to disseminate accurate and truthful information with respect to its financial condition

25   and performance, growth, operations, financial statements, business, products, markets,

26   management, earnings and present and future business prospects, so that the market price of

27   Alphatec's common stock would be based upon truthful and accurate information.  Defendants'

28   misrepresentations and omissions during the relevant period violated these specific requirements

1   and obligations and allowed certain of them to sell the Company's common stock at artificially

2   inflated prices.

3       3.      Alphatec has grown over the last several years from revenues of $80 million in 2007

4   and $101 million in 2008 to $132 million in 2009.  Despite this growth, Alphatec has, on occasion,

5   lacked growth capital, and to support operations has relied upon controlling shareholder

6   Healthpoint Capital, LLC, which is the ultimate parent of HealthpointCapital Partners, L.P. and

7   HealthpointCapital Partners II, L.P. (collectively with Healthpoint Capital, LLC,

8   "HealthpointCapital" or the "HealthpointCapital Defendants"), for infusions of capital. For

9   example, in June 2009, Alphatec turned to HealthpointCapital for $10 million in private placement

10  financing. HealthpointCapital currently owns and controls approximately 38% of Alphatec's

11  outstanding shares, and at times has owned a majority of the Company's outstanding shares.

12      4.      For several years prior to 2010, HealthpointCapital also owned a controlling interest

13  in Scient'x, another spinal products company based in France.  HealthpointCapital first acquired an

14  interest in Scient'x in June 2004, when it paid $28 million for a 33% interest, based on its valuation

15  of Scient'x at approximately $85 million. HealthpointCapital purchased an additional 61% interest

16  in Scient'x in November 2007, paying $111 million, based on a valuation of the enterprise at that

17  time at approximately $185 million.  Thus, based on these two transactions, HealthpointCapital's

18  total cash outlay to buy a 94% interest in Scient'x was $139 million.

19      5.      By late 2009, HealthpointCapital was interested in divesting itself of Scient'x, even

20  at a loss, and it turned to Alphatec, which HealthpointCapital also controlled, as a potential

21  purchaser of Scient'x. Such a transaction could allow HealthpointCapital to partly limit its

22  liabilities and escape its investment in Scient'x, and recover some of its cash investment. In the

23  latter part of 2009, Defendant Mortimer Berkowitz, HealthpointCapital's President and Managing

24  Director, and Chairman of Alphatec's Board, along with four other interested directors of the

25  Company, began to devise a transaction whereby Alphatec would acquire Scient'x.

26      6.      On December 17, 2009, Alphatec and HealthpointCapital announced that Alphatec

27  would acquire Scient'x by issuing HealthpointCapital 24 million shares of Alphatec common stock,

28  worth approximately $120 million (the "Acquisition").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 2 -
CASE NO. _____

7.     As a result of the Company's announcement, the Company's shares rose 8%. In reality, the revenue and income projections (the "Projections") contained in the Company's December 17, 2009 press release were designed to offset or omit the truth behind the deal's negatives in order to increase interest in the Company's stock and a possible future public offering. Fundamental information that was omitted from the Projections regarding the propriety of the Acquisition included the fact that both Alphatec and Scient'x were losing money, and that Alphatec faced the likelihood that any integration of Scient'x would drain its available cash and limit its planned crossover to profitability.

8.     Since five of the Company's nine directors are affiliated with HealthpointCapital, the Board's approval of the transaction was certain, despite the effect the Acquisition would have on Alphatec. However, despite HealthpointCapital's control and domination of Alphatec through the interested and affiliated directors that served on Alphatec's Board, both HealthpointCapital and the Board of Alphatec needed shareholder approval to ensure that the Acquisition would occur. To that end, the defendants issued the false and misleading Projections for both Alphatec and Scient'x, as well as false and misleading proxy statements filed with the SEC on December 18, 2009, December 22, 2009, and February 12, 2010, respectively (the "Proxy Statements") and disseminated to Company shareholders. These misleading Projections, and the information in the Proxy Statements, were not based in fact, but created the necessary shareholder support to approve the Acquisition and boost the Company's stock price.

9.     As well, the Company's Proxy Statements disseminated in connection with the Acquisition recommended that shareholders vote in favor of the issuance of stock to complete the Acquisition, claiming that the Acquisition was approved by a Special Committee of the Board and that the Acquisition was in the best interests of the shareholders. The recommendations contained in the Proxy Statements were false and misleading because they were made despite the assertion of improper earnings guidance that claimed that: "the Company expects 2010 pro forma full-year revenues to be in a range of $220 million to $225 million, and pro forma full-year 2010 adjusted EBITDA to be in a range of $32 million to $35 million," which defendants knew were unachievable.

10.     On March 26, 2010, the Company completed the acquisition of Scient'x, and the transaction ultimately increased HealthpointCapital's control and ownership of the Company from 37% to 56%.   As a result of the Acquisition, the Company faced immediate and significant problems stemming from the necessity to integrate the internal organization, personnel, and products of Scient'x. As defendants expected, as a result of the failure of Alphatec to timely and efficiently integrate the property and resources of Scient'x, while facing imminent pricing pressures from its markets, the Company was unable to meet its earnings, revenue and EBITDA guidance during 2010.   Despite this knowledge, the defendants continued to promote the misleading Projections after the Acquisition.

11.     Defendants soon determined that the Acquisition would have to be followed quickly by a cash raise, most likely via a public offering of Alphatec stock. On April 12, 2010, Alphatec announced a secondary public offering wherein the Company would sell 8 million shares and HealthpointCapital would also sell an additional 8 million shares. The offering, priced at $4.75 per share, closed on April 21, 2010, and allowed HealthpointCapital to dump a significant number of its Alphatec shares.   Indeed, with over-allotments, Alphatec sold 9.2 million shares, and HealthpointCapital sold 9.2 million shares, allowing each to enjoy approximately $44 million in proceeds.

12.     Although the Company's financial situation worsened as 2010 went on, defendants continued to reiterate their false and misleading revenue and income Projections through the second quarter of 2010.

13.     On August 5, 2010, after the market close, Alphatec shocked investors by announcing its actual quarterly results for the second quarter of 2010 and an extreme downward revision of the misleading revenue and income Projections for the year.   In response, the price of Alphatec shares immediately dropped 46%, or $2.03, to $2.39 on volume of 13.18 million shares.

14.     The Company's Board and executives, as well as HealthpointCapital, caused the harms alleged herein, by forcing the Company to acquire Scient'x, to publish false and misleading Projections, and to disseminate false Proxy Statements. As a result, HealthpointCapital and its affiliated directors have reaped approximately $44 million through the sale of the Company's stock

at an inflated price, and the Company has sustained substantial damages as a result of the overpriced and improper Scient'x Acquisition.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that the Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United State which it would not otherwise have.

16.     Further, this Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the allegations contained herein, in part, pertain to the submission and dissemination of false proxy statements in violation of §14(a).

17.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  Several of the Individual Defendants either reside in or maintain executive offices in this county, and have received substantial compensation in this county by engaging in numerous activities and conducting business here, which had an effect in this district.

**PARTIES**

18.     Plaintiff, a citizen of the State of Illinois, is a shareholder of Alphatec, was a shareholder of Alphatec at the time of the wrongdoing alleged herein, and has been a shareholder of Alphatec continuously since that time.

19.     Nominal Defendant Alphatec, through its wholly owned subsidiary, Alphatec Spine, Inc., engages in the design, development, manufacture, and marketing of products for the surgical treatment of spine disorders, focusing primarily on the aging spine. Alphatec is incorporated in the State of Delaware, and has its principal offices located at 5818 El Camino Real, Carlsbad, California 92008.  It sells its products through independent distributors, direct sales representatives, and sales management employees and executives in the United States, Asia, and Europe.  Alphatec states that "[i]n addition to its U.S. operations, the Company also markets its

products in over 50 international markets through its subsidiary, Scient'x SA, via a direct sales force in France, Italy and the United Kingdom and via independent distributors in the rest of Europe, the Middle East and Africa, South America and Latin America.  In Asia and Australia, the Company markets its products through its subsidiary, Alphatec Pacific, Inc, and through Scient'x's distributors in China, Korea and Australia."

20.     Defendant HealthpointCapital, LLC is the ultimate parent of Defendant HealthpointCapital Partners, L.P. and Defendant HealthpointCapital Partners II, L.P.  Defendant HealthpointCapital Partners, L.P., a Delaware limited partnership, currently owns approximately 10,877,183 Alphatec shares, and Defendant HealthpointCapital Partners II, L.P., also a Delaware limited partnership, currently owns approximately 22,454,744 Alphatec shares. Together the HealthpointCapital Defendants own and control approximately 38% of Alphatec's outstanding shares. The HealthpointCapital Defendants are venture capital and private equity investors specializing in companies producing orthopedic, spinal and dental devices and implants, and maintain their executive offices at 505 Park Avenue, 12th Floor, New York, New York 10022.

21.     Defendant Mortimer Berkowitz III ("Berkowitz") has served as Chairman of the Board of Alphatec Holdings, Inc. and Alphatec Spine since April 2007.  He is currently a managing member of HGP, LLC, which is the general partner of HealthpointCapital Partners, LP, and President, a member of the Board of Managers and a managing director of HealthpointCapital, LLC.  He has held the position with HGP, LLC since its formation in August 2002, the positions of managing director and member of the Board of Managers of HealthpointCapital, LLC since its formation in July 2002 and the position of President of HealthpointCapital, LLC since February 2005.  Prior to joining HealthpointCapital, LLC, Berkowitz was managing director and co-founder of BPI Capital Partners, LLC, a private equity firm founded in 1990.  Prior to 1990, Berkowitz spent 11 years in the investment banking industry with Goldman, Sachs & Co., Lehman Brothers Incorporated and Merrill Lynch & Co.  He is a director of BioHorizons, Inc., a privately-held dental implant company that is a HealthpointCapital portfolio company.  Defendant Berkowitz is and was a director of Scient'x, a French spinal implant company that is also a HealthpointCapital

1    portfolio company, at the time Alphatec acquired Scient'x in March 2010.  Upon information and

2    belief, Defendant Berkowitz is a citizen of the State of New York.

3          22.    Defendant John H. Foster ("Foster") has served as a Director of Alphatec Holdings,

4    Inc. and Alphatec Spine since March 2005.  From March 2005 until April 2007, Foster served as

5    Chairman of Alphatec's Board of Directors.  From December 2006 until June 2007, he served as

6    President and CEO of Alphatec Holdings, Inc. and Alphatec Spine.  From October 2006 until

7    December 2006, he served as Executive Chairman of Alphatec Holdings, Inc. and Alphatec Spine.

8    Foster also served as Alphatec Holdings, Inc. and Alphatec Spine's CEO from March 2005 to

9    October 2005. He is currently a managing member of HGP, LLC, and Chairman, CEO, member of

10    the Board of Managers and a managing director of HealthpointCapital, LLC.  He has held the

11    position with HGP, LLC since its formation in August 2002 and the positions with

12    HealthpointCapital, LLC since its formation in July 2002.  Defendant Foster is a Scient'x director

13    and was a director of Scient'x or an affiliate of Scient'x at the time of the Scient'x Acquisition.

14    Upon information and belief, Defendant Foster is a citizen of the State of New York.

15          23.    Defendant R. Ian Molson ("Molson") has served as a Director of Alphatec

16    Holdings, Inc. and Alphatec Spine since July 2005, and serves as a member of the Company's

17    Audit and Compensation Committees. Defendant Molson currently serves on the board of

18    managers of HealthpointCapital. Defendant Molson was also a director of Scient'x or an affiliate

19    of Scient'x at the time of the Scient'x Acquisition.  Upon information and belief, Defendant

20    Molson is a citizen of London, England.

21          24.    Defendant Stephen E. O'Neil ("O'Neil") has served as a Director of Alphatec

22    Holdings, Inc. and Alphatec Spine since July 2005, and serves as a member of the Company's

23    Audit Committee and as Chairman of the Compensation Committee.  Defendant O'Neil also

24    currently serves on the board of managers of HealthpointCapital.  Upon information and belief,

25    Defendant O'Neil is a citizen of the State of New York.

26          25.    Defendant Stephen H. Hochschuler ("Hochschuler") has served as a Director of

27    Alphatec Holdings, Inc. and Alphatec Spine since October 2006. Hochschuler has also served as

28    Chairman of the Company's Scientific Advisory Board since October 2005. Defendant

Hochschuler also serves as a clinical advisor to HealthpointCapital. A HealthpointCapital press release issued on February 26, 2008, regarding Hochschuler's appointment as a Clinical Advisor, states: "Dr. Hochschuler's unparalleled understanding of medical science and advanced technologies will allow [HealthpointCapital] to better deliver to the marketplace and create value for our investors. Dr. Stephen H. Hochschuler stated, 'I am pleased to ***be working more closely with HealthpointCapital***… I am confident this partnership will lead to important advancements in the orthopedic device industry.'"(*emphasis added*).  A prospectus supplement filed with the SEC on Form 424B5 on February 10, 2010, lists Hochschuler's name under the section specifying certain members of the Alphatec Board that also serve as officers and directors of HealthpointCapital. Although Defendant Hochschuler's agreement with HealthpointCapital is not publicly available, Alphatec's proxy statement, filed with the SEC on June 28, 2010, discusses Hochschuler's role and compensation as a scientific advisor to Alphatec:

> In 2005, we and Alphatec Spine entered into an agreement with Dr. Stephen H. Hochschuler, who became one of our directors in October 2006, pursuant to which Dr. Hochschuler agreed to serve as the Chairman of our Scientific Advisory Board. Pursuant to the agreement we pay Dr. Hochschuler for attending Scientific Advisory Board meetings and he received equity compensation in connection with the agreement. In October 2006, we and Alphatec Spine entered into a Consulting Agreement with Dr. Hochschuler. Pursuant to the terms of the agreement, we agreed to appoint Dr. Hochschuler to our and Alphatec Spine's Board of Directors until the next annual meeting of each of its stockholders or until his successor is duly appointed and qualified. Pursuant to the agreement, Dr. Hochschuler is required to provide advisory services to us related to the spinal implant industry and our research and development strategies. The agreement had an initial term of three years, and in October 2009 it automatically renewed for an additional year. The agreement will continue to automatically renew each year unless it is terminated prior to its automatic renewal date in October. In return for such advisory services, we paid Dr. Hochschuler cash and equity compensation. In 2009, we paid an aggregate of $0.2 million to Dr. Hochschuler pursuant to these agreements.

Upon information and belief, Defendant Hochschuler is a citizen of the State of Arizona.

26.    Defendant James R. Glynn ("Glynn") has served as a Director of Alphatec Holdings, Inc. and Alphatec Spine since April 2007, and serves as Chairman of the Company's Audit Committee. Defendant Glynn was a member of the special committee created to evaluate and recommend the Scient'x Acquisition. Upon information and belief, Defendant Glynn is a citizen of the State of California.

27. Defendant Rohit M. Desai ("Desai") has served as a Director of Alphatec Holdings, Inc. and Alphatec Spine since January 2008. Upon information and belief, Defendant Desai is a citizen of the State of New York.

28. Defendant Dirk Kuyper ("Kuyper") has served as a Director of Alphatec Holdings, Inc. and Alphatec Spine since January 2008. Defendant Kuyper has also served as the President and Chief Executive Officer of Alphatec Holdings, Inc. and Alphatec Spine, since June 2007. Upon information and belief, Defendant Kuyper is a citizen of the State of California.

29. Defendant Siri S. Marshall ("Marshall") has served as a Director of Alphatec Holdings, Inc. and Alphatec Spine since October 2008. Defendant Marshall was a member of the special committee created to evaluate and recommend the Scient'x Acquisition. Upon information and belief, Defendant Marshall is a citizen of the State of Minnesota.

30. Defendant Peter C. Wulff ("Wulff") has served as the Chief Financial Officer, Vice President and Treasurer of Alphatec Holdings, Inc. and Alphatec Spine since June 2008. Upon information and belief, Defendant Wulff is a citizen of the State of California.

31. Collectively, defendants Berkowitz, Foster, Molson, O'Neil, Hochschuler, Glynn, Desai, Kuyper, Marshall, and Wulff are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34. To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

- exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

- refrain from wasting the Company's assets;

- refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

- properly disclose all material information regarding the Company, required by applicable state and federal laws and or their relevant duties, to the Company's shareholders.

35. The Company's Code of Conduct, which was in effect at the time of the Individual Defendants' misconduct, required them to not engage in any transactions that presented a conflict of interest and to make fair, accurate, timely, and coherent disclosures. The Code of Conduct required the Individual Defendants to, *inter alia*:

- demonstrate legal and ethical behavior;

- comply with all applicable laws, rules, regulations and guidelines;

- ensure that all conflicts of interest are handled in accordance with this Code of Conduct;

- refrain from using your position in the Company or the Company's assets or information for improper personal gain;

- take all actions necessary to ensure that the Company produces fair, accurate, timely and coherent disclosure in all reports and documents that the Company files with the Securities and Exchange Commission, and in its communications to the public; and

- properly use and prevent the improper disclosure of the Company's proprietary information; and

- protect the Company's assets and immediately report any suspected theft or fraud involving the Company's assets.

36. The Company's Audit Committee currently has three members, defendants Glynn (Chairman), Molson and O'Neil, who owe specific duties to the Company in addition to the general duties listed above. The Audit Committee's written charter mandates that the Audit Committee members review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements, both generally and specifically with regard to the Scient'x Acquisition. The Audit Committee's charter further obligates the committee to assure compliance with all applicable laws, regulations, and corporate policy and to, *inter alia*:

- review the Corporation's annual financial statements and Form 10-K prior to the filing of the Form 10-K or prior to the release of earnings;

- review each Form 10-Q prior to its filing or prior to the release of earnings;

- review the effect of regulatory and accounting initiatives that may affect the Corporation, as well as the effect of any off-balance sheet structures and transactions on the Corporation's financial statements;

- report annually to the shareholders, describing the Committee's composition, responsibilities and how they were discharged, and any other information required by rule, including approval of non-audit services;

- review any other reports the Corporation issues that relate to Committee responsibilities;

- institute and oversee special investigations as needed;

- review the integrity of the Corporation's financial reporting processes, both internal and external. The Committee shall report regularly to and review with the full Board any issues that arise with respect to the quality or integrity of the Corporation's financial statements, compliance with legal or regulatory requirements, the performance and independence of the independent auditor, or the performance of the internal audit function;

- review significant accounting and reporting issues, including complex or unusual transactions (such as off-balance sheet structures, if any) and highly judgmental areas, and recent professional and regulatory pronouncements, and understand their impact on the financial statements;

- review the annual financial statements, and consider whether they are complete, consistent with information known to committee members, and reflect appropriate accounting principles;

- review other sections of the annual report and related regulatory filings before release and consider the accuracy and completeness of the information;

- review interim financial reports with management and the external auditors before filing with regulators, and consider whether they are complete and consistent with the information known to committee members;

- inquire of management and the independent auditors about significant risks or exposures facing the Corporation;

- review, with the Corporation's counsel, any legal or regulatory matter that could have a significant impact on the Corporation's financial statements;

- review and approve, prior to the Corporation's entry into any such transactions, all transactions between the Corporation and its executive officers, members of its Board, beneficial holders of more than 5% of the Corporation's securities, immediate family members of any of the foregoing persons, and any other parties whom the Board determines may be considered to be related parties; and

- when deemed necessary by the members of the Audit Committee, retain independent legal, accounting or other advisors or consultants to advise and assist the Audit Committee in carrying out its duties.

37. The Company's Compensation Committee currently has two members, defendants O'Neil (Chairman) and Molson. The Compensation Committee is required to review, approve and make recommendations regarding the Company's compensation policies, practices and procedures, to ensure that legal and fiduciary responsibilities of the Board are carried out and that such policies, practices and procedures contribute to the Company's success. The Compensation Committee also administers the Company's Amended and Restated 2005 Employee, Director and Consultant Stock Plan, and is responsible for the determination of the compensation of the CEO, defendant Kuyper. The Compensation Committee's charter obligates the committee to, *inter alia*:

- establish a compensation policy for executives designed to (i) enhance the profitability of the Company and increase stockholder value, (ii) reward executive officers for their contribution to the Company's growth and profitability, (iii) recognize individual initiative, leadership, achievement, and other contributions and (iv) provide competitive compensation that will attract and retain qualified executives;

- subject to variation where appropriate, the compensation policy for executive officers and other key employees shall include (i) base salary, which shall be set on an annual or other periodic basis, (ii) annual or other time or project based incentive compensation, which shall be awarded for the achievement of predetermined financial, project, research or other designated objectives of the Company as a whole and of the executive officers and key employees individually and (iii) long-term incentive compensation in the forms of equity participation and other awards with the goal of aligning, where appropriate, the long-term interests of executive officers and other key employees with those of the Company's stockholders and otherwise encouraging the achievement of superior results over an extended time period;

- annually review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and

objectives, and recommend to the Board the CEO's compensation levels based on this evaluation;

- annually review and make recommendations to the Board with respect to compensation of directors, executive officers of the Company other than the CEO and key employees;

- approve employment contracts, severance arrangements, change in control provisions and other agreements for executive officers and key employees;

- approve and administer cash incentives and deferred compensation plans for executives (including any modification to such plans) and oversight of performance objectives and funding for executive incentive plans;

- approve and administer compensation programs involving the use of the Company's stock;

- prepare annual reports summarizing top executives' compensation levels and explaining the relationship between executive compensation and the organization's performance, as required by the SEC; and

- oversee the annual process of performance evaluations of the Company's management.

38.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Alphatec, and HealthpointCapital, through its controlling ownership interest in the Company and its affiliation with a majority of the Board, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements and SEC financial filings, issued or disseminated by the Company.

**SUBSTANTIVE ALLEGATIONS**

39.    Alphatec is a medical technology company focused on the development and manufacture of surgical spinal implants and other devices designed to treat spinal disorders of the aging spine. Alphatec has grown swiftly over the last several years, from revenues of $80 million in 2007, to $101 million in 2008, to $132 million in 2009.  Despite this record, Alphatec's stock price has been erratic, and the Company has on occasion lacked growth capital.

40.    Before the Scient'x Acquisition, HealthpointCapital owned approximately 39% of Alphatec's outstanding common stock, and Alphatec had been reliant on HealthpointCapital for continued capital infusions to fund its operations, *e.g.*, $10 million of private placement financing Alphatec received from HealthpointCapital in June 2009.

41.    In return for its capital investments, HealthpointCapital controls the direction and operation of the Company, as defendants Berkowitz, Foster, Molson, O'Neil, and Hochschuler, who collectively constitute a majority of the Board, all have high ranking management or consulting positions with HealthpointCapital. Further, two of these individuals, defendants O'Neil and Molson, constitute Alphatec's entire Compensation Committee, which controls the compensation paid to Alphatec's officers, *e.g.*, defendant Kuyper (CEO) and defendant Wulff (CFO).

42.    HealthpointCapital is a private equity firm focused primarily in research-based businesses in the orthopedic and dental industries. HealthpointCapital manages approximately $750 million, and had substantial investments in Alphatec and Scient'x, having investing $60 million in Alphatec and $139 million in Scient'x. Healthpoint Capital currently controls 33,331,817 shares of Alphatec common stock, or approximately 38% of the Company's outstanding shares.

43.    Scient'x, like Alphatec, is engaged in the design and manufacture of spinal devices, and offers these products through a network of distributors in not only the United States, but also the United Kingdom, Switzerland, Germany, Italy, the Middle East, and Africa. HealthpointCapital first acquired a 33% interest in Scient'x in June 2004 for approximately $28 million. Then, in November 2007, HealthpointCapital acquired an additional 61% interest in Scient'x for an additional $111 million. During the time that defendants Berkowitz, Foster, and Molson served the boards of directors of both Scient'x and Alphatec, HealthpointCapital acquired a total of 97% of Scient'x for a total outlay of $139 million.

## APPROVAL OF THE SCIENT'X ACQUISITION

44.    In April 2009, HealthpointCapital was looking to recover some of the money it had spent to acquire Scient'x by selling Scient'x to Alphatec, and representatives of both Alphatec and Scient'x began discussing a possible acquisition of Scient'x. At that time, both Alphatec and Scient'x were losing money. Alphatec's losses were diminishing, however, and the Company expected to post a profit in 2010, while Scient'x lost approximately $10.2 million in the first nine months of 2009 and projected a net loss of $17.6 million for fiscal year 2010.

45.     HealthpointCapital and the interested individuals who comprised a majority of the Board (defendants Berkowitz, Foster, O'Neil, Molson, and Hochschuler) attempted to give the impression of arm's-length negotiations by establishing a special committee of two Alphatec directors unaffiliated with HealthpointCapital (the "Special Committee"), consisting of defendants Glynn and Marshall, to negotiate on behalf of Alphatec.  The Board asserted that this Special Committee would lead an independent evaluation, investigation, and negotiation of any acquisition of Scient'x.

46.     After formation of the Special Committee to evaluate and investigate the Scient'x Acquisition, HealthpointCapital determined that Defendant Berkowitz should negotiate the transaction on behalf of Scient'x, despite serving as Alphatec's Chairman of the Board, and having extensive inside non-public knowledge about both companies. The Special Committee, however, did not benefit or negotiate from a similar position.  Despite this disparity, over the next six months the Special Committee and Berkowitz negotiated a potential acquisition of Scient'x.

47.     On September 24, 2009, the Special Committee and Berkowitz's negotiations culminated in the determination of a price that Alphatec would pay HealthpointCapital for the Acquisition of Scient'x. However, on December 9, 2009, Defendant Berkowitz informed Defendant Kuyper that HealthpointCapital had received a proposal to acquire Scient'x from a third party, and backed out of the negotiations with Alphatec.

48.     On December 14, 2009, Defendant Berkowitz requested that the Special Committee hold its offer open through January 8, 2010, in order to allow the third party bidder to complete diligence and negotiate material terms for the acquisition of Scient'x.  Defendant Berkowitz, however, refused to share the specific terms of the third party's offer with the Special Committee, despite the long history of negotiations that had occurred between them.  As a result, the Special Committee advised defendants Berkowitz and HealthpointCapital that the offer would be held open only through December 16, 2009.

49.     In response to this deadline, HealthpointCapital circumvented the Special Committee by communicating directly with other directors of the Company.  Eventually, as a result

of pressure from the other Board members, the Special Committee continued negotiations with Defendant Berkowitz.

50.     On December 16 and 17, 2009, the Special Committee and HealthpointCapital agreed to an increase in the consideration for Scient'x to 24 million shares, and after final revisions to the agreement, the Special Committee recommended approval of the Scient'x Acquisition.  This recommendation would not have occurred absent the undue influence of HealthpointCapital and the interested Board members.  Eventually, on December 24, 2009, the Board recommended that the Company's shareholders vote for the Scient'x Acquisition based solely on this improper recommendation of the Special Committee.

51.     In effect, HealthpointCapital used its status as the Company's largest shareholder, with a majority of the Board being interested in the successful outcome, to effectuate the completion of the Scient'x Acquisition in order to provide a means to compensate itself for its failing investment.

52.     Because a majority of the Company's directors had a direct financial interest in the Scient'x Acquisition by having high ranking management or consulting positions with Healthpoint Capital, and because these directors dominated and controlled the Board of Alphatec, this transaction is not protected by the business judgment rule and instead must be considered under the entire fairness standard, which it cannot meet, as discussed herein.

53.     Considering that Scient'x had exhibited almost no revenue growth in the first nine months of 2009, and had lost $10.2 million during that period and projected a net loss of $17.6 million for fiscal year 2010, the defendants overpaid to acquire Scient'x, which was not worth the 24 million shares of stock valued at approximately $120 million that Alphatec paid for it.

54.     Additionally, the process by which the Special Committee conducted its consideration of the Acquisition and the process by which the shareholders approved the Acquisition were tainted by defendants' misconduct.  HealthpointCapital and the Company's interested directors put undue pressure on the Special Committee and unduly interfered with the Acquisition process.  Further, in seeking the required shareholder approval, the Individual

Defendants disseminated false and misleading information via Projections and Proxy Statements, as discussed further below.

55. Because the Individual Defendants cannot demonstrate either that they paid a fair price for Scient'x or that there was fair dealing in the process of approving the Acquisition, the transaction does not meet the entire fairness standard.

### THE FALSE AND MISLEADING STATEMENTS AND FALSE 2010 PROXY STATEMENTS LEADING TO THE SHAREHOLDER VOTE

56. In addition to the Board's and Special Committee's approval of the Acquisition, HealthpointCapital also needed to obtain approval from a majority of the Company's shareholders to issue new stock to complete the Acquisition. HealthpointCapital and the Individual Defendants accomplished this by making false and misleading statements about the Company's financial condition and prospects and filing and disseminating to shareholders false Proxy Statements that misrepresented and omitted material information regarding the transaction.

57. On December 17, 2009, Alphatec issued a press release stating that the Company had entered into an agreement to acquire Scient'x in an all stock transaction, and that to pay for this transaction the Company would need to issue 24 million shares of its stock. In this press release the Board asserted that an independent Special Committee had evaluated and approved the acquisition of Scient'x.

58. HealthpointCapital held approximately 39% of the Company's stock, and because a simple majority vote was required to issue the stock, the Individual Defendants and HealthpointCapital only needed to obtain an additional 11% of the shareholders to approve the Scient'x Acquisition. To obtain this approval, the Individual Defendants provided false and misleading Projections that significantly overstated the Company's ability to generate revenue and successfully integrate Scient'x into the Company. On December 17, 2009, Defendants Kuyper and Wulff, with the specific review and approval of Audit Committee members Glynn, Molsen, and O'Neil, stated that after the Acquisition was completed, the Company would generate a 60% increase in revenue. This 60% growth was approximately double the growth that Alphatec experienced in 2008 and 2009, which was 26.6% and 30.4%, respectively. The Individual

1  Defendants stated in the press release that they expected "2010 pro form full-year revenues to be in

2  a range of $220 million to $225 million, and pro forma full-year 2010 adjusted EBITDA to be in a

3  range of $32 million to $35 million." The press release also asserted a claim of EBITDA growth as

4  high as 58% for 2010, during a time when the Company was significantly increasing costs to

5  integrate Scient'x, making its ability to meet those projections exceedingly improbable. The press

6  release specifically stated that:

7  Alphatec Holdings, Inc. (Nasdaq:ATEC), the parent company of Alphatec Spine,
   Inc., a medical device company that designs, develops, manufactures and markets
8  products for the surgical treatment of spine disorders, with a focus on treating
   conditions affecting the aging spine, announced today that it has entered into a
9  definitive agreement to acquire Scient'x Groupe SAS, a spinal implant company
   headquartered in France.
10
   The transaction is structured as an all stock transaction such that 100% of
11  outstanding Scient'x stock will be exchanged pursuant to a fixed ratio for 24 million
   shares of the Company's common stock. On a pro forma basis, current Alphatec
12  shareholders will own approximately 69% of the combined company and
   approximately 31% will be held by current Scient'x shareholders. The transaction is
13  currently expected to close by the end of the first quarter of 2010 and is subject to
   the approval of the Company's shareholders. Subject to the closing of the
14  transaction, the Company expects 2010 pro forma full-year revenues to be in a range
   of $220 million to $225 million, and pro forma full-year 2010 adjusted EBITDA to
15  be in a range of $32 million to $35 million. The transaction is expected to be neutral
   to slightly positive to 2010 EPS and accretive to 2011 EPS, excluding amortization
16  of intangible assets, transaction expenses and related restructuring charges. The
   Company has absorbed transaction-related costs that had a negative impact to EPS
17  in the third quarter and are expected to negatively impact previously issued EPS
   guidance for the fourth quarter of 2009. The Company also expects to absorb
18  additional transaction-related expenses in the first quarter of 2010.

19  The transaction was unanimously approved by a Special Committee of independent
   members of the Company's Board of Directors, Following such approval by the
20  Special Committee, the Company's Board of Directors unanimously approved the
   acquisition agreement.
21
22      59.     As a result of the Company's announcements, the Company's shares rose 8%.  In

23  reality, the revenue and income Projections contained in the press release were designed to offset

24  or omit the truth behind the deal's negatives in order to increase interest in the Company's stock and

25  a possible future public offering.

26      60.     Fundamental information regarding the propriety of the Acquisition that was

27  omitted from the Projections included the fact that Alphatec and Scient'x were both losing money.

28  For the nine months ending Sept. 30, 2009, Alphatec lost $11.97 million, and for that same period,

1   Scient'x had lost $10.2 million and was projecting a further net loss of $17.6 million in 2010.

2   Although Alphatec was projecting net income for 2010, at the time of the Acquisition, Alphatec

3   faced the likelihood that any integration of Scient'x would drain its available cash and limit its

4   planned crossover to profitability.

5         61.    The Projections, at or about the time of the Acquisition, were unreasonable and

6   reckless because the Individual Defendants knew, but failed to disclose, that: (a) pricing pressures

7   in the U.S. and Europe were steadily increasing, and had been increasing since the fall of 2009,

8   especially in Alphatec's important Florida market; (b) Alphatec planned to eliminate an Asian

9   distributor, which produced $12 million in annual revenues, without any realistic plan to replace

10   those lost revenues; (c) Scient'x, under the best of circumstances, had exhibited almost no revenue

11   growth in the first nine months of 2009, and its ability to market and sell at even the same level in

12   2010 would be disrupted by any acquisition; and (d) integrating the two companies would affect

13   2010 revenues and earnings in a negative manner.

14         62.    The Company reiterated these misleading Projections in two separate Proxy

15   Statements filed with the SEC on December 18, 2009, one stating, in part, that:

16       The transaction was unanimously approved by a Special Committee of independent
    members of the board. Following such approval by the Special Committee, the
17   entire board unanimously approved the transaction.

18       Represents pro-forma combined $180-$182M 2009 revenue, 25-30% growth y/y

19       Pro forma 2010 revenue estimated to reach $220-$225M; $32-$35M adjusted
    EBITDA (12 month annualized)
20

21   The other Proxy Statement stated, in part, that:

22       Subject to the closing of the transaction, the Company expects 2010 pro forma full-
    year revenues to be in a range of $220 million to $225 million, and pro forma full-
23   year 2010 adjusted EBITDA to be in a range of $32 million to $35 million.

24       The [Scient'x] transaction was unanimously approved by a Special Committee of
    independent members of the Company's Board of Directors. Following such
25   approval by the Special Committee, the Company's Board of Directors unanimously
    approved the acquisition agreement.

26       The Company believes that the strategic merit of the combined business includes the
    following benefits to its shareholders:
27

28       •     Increases scale and global presence in all major geographic markets

- Provides cross-selling opportunities in major markets to leverage future growth across core spine products and Aging Spine products

- Strengthens and expands the Company's product portfolio with differentiated products in all segments

- Enhances the Company's ability to educate, train and service its spine surgeon customers

- Provides cost synergies in distribution, marketing and administration infrastructure

- Diversifies potential future U.S. healthcare reform and regulatory risks

"We believe that Scient'x is a perfect complementary strategic fit for Alphatec Spine," stated Dirk Kuyper, Alphatec Spine's President and Chief Executive Officer. Mr. Kuyper continued, "Besides the significant cost and revenue synergies the acquisition offers, Alphatec Spine will now have the opportunity to reach 50 international markets with our aging spine and core fusion technologies. This transaction moves us into position to be able to become one of the top global spine companies."

"I am pleased to have the opportunity to work closely with Oliver Burckhardt again, following our time together at Aesculap Inc. He will be instrumental in overseeing our international sales efforts and will lead the strategic marketing direction of the combined company. We believe that the combination of Alphatec Spine and Scient'x creates a complete and broad product portfolio with differentiated products addressing underserved markets with disruptive technologies," continued Mr. Kuyper.

63.     On December 22, 2009, the Company filed with the SEC another Proxy Statement, reiterating, in part, that:

The Company's board of directors formed a special committee of disinterested directors to evaluate and, if appropriate, negotiate the transaction with Scient'x, and such special committee unanimously recommended that the board of directors and stockholders approve the Share Purchase Agreement and the issuance of the Company's shares contemplated therein. Following such recommendation by the special committee, the Company's board of directors unanimously approved the Share Purchase Agreement.

64.     Finally, on February 12, 2010, the Company filed with the SEC its definitive Proxy Statement, recommending that the shareholders vote in favor of the issuance of stock to complete the Scient'x Acquisition, and again asserting that the Special Committee was disinterested. Additionally, the Board improperly claimed that the Scient'x Acquisition was in the best interest of the shareholders, specifically stating that:

Upon the unanimous recommendation of a special committee of the disinterested directors, our board of directors has unanimously approved the proposal referred to above and concluded that it is advisable, fair to, and in the best interests of our

stockholders unaffiliated with HealthpointCapital. The special committee and our board of directors unanimously recommend that our stockholders vote "FOR" the proposal referred to above.

In addition, the Proxy Statement incorporated by reference the false earnings and revenue guidance previously provided by defendants Kuyper and Wulff, with the approval of the Board.

65.     On February 23, 2010, the Company announced its fourth quarter and full year 2009 revenue and financial results, which affirmed the Projections that the Individual Defendants provided when they announced the Scient'x Acquisition. This press release stated, in part:

> As previously announced, the Scient'x transaction is currently expected to close by the end of the first quarter of 2010 and is subject to the approval of the Company's shareholders. The Company has absorbed transaction-related costs that had a negative impact to GAAP EPS in the third and fourth quarters of 2009. The Company also expects to absorb additional transaction-related expenses in the first quarter of 2010.

66.     Also on February 23, 2010, defendants Wulff and Kuyper held a conference call to discuss the substance of the Scient'x Acquisition. Defendant Kuyper stated, in pertinent part, that:

> At this point, I'd like to provide financial guidance for the first quarter 2010 and to reaffirm our guidance for pro forma financials for the full year 2010.

> We expect first quarter 2010 revenues of $38 million and an adjusted EBITDA margin of at least 15%. The financial guidance for the first quarter 2010 reflects operating results prior to the acquisition of Scient'x.

> We are reaffirming 2010 financial guidance from December 17, 2009, which we provided when we announced the Scient'x acquisition. We anticipate annualized pro forma revenue of $220 million to $225 million and $32 to $35 million in annualized adjusted EBITDA and positive EPS for full year 2010 excluding amortization of intangible assets, transaction expenses, and related restructuring charges.

### THE COMPANY'S APRIL 2010 SECONDARY PUBLIC OFFERING

67.     The Company's completed acquisition of Scient'x, which closed in March 2010, ultimately increased HealthpointCapital's control and ownership of the Company from 39% to 56%. As a result of the Acquisition, the Company faced immediate and significant problems stemming from the necessity to integrate the internal organization, personnel, and products of Scient'x while facing imminent pricing pressures from its markets.  Defendants knew that the Company would be unable to meet its earnings, revenue and EBITDA guidance for 2010.  Despite this knowledge, the defendants continued to promote the misleading Projections after the Acquisition was completed.

68.     Because Alphatec had acquired a company that was losing money, HealthpointCapital and its affiliated directors decided to conduct a secondary public offering in April 2010 (the "April 2010 Offering") to monetize their investment in Scient'x. The Company announced the April 2010 Offering on April 12, 2010, wherein the Company and HealthpointCapital would each sell an additional 8 million shares. The offering was priced at $4.75 and would close on April 21, 2010.

69.     The April 2010 Offering allowed HealthpointCapital and its affiliated directors to dump a significant number of Alphatec shares based on their knowledge of material non-public information. HealthpointCapital sold, with over-allotments, a total of 9.2 million shares, generating illicit proceeds of approximately $44 million. HealthpointCapital had not previously disposed of any of the Company's stock since the Company's initial public offering in June 2006.

70.     On August 5, 2010, after the market close, Alphatec shocked investors by announcing the following in a press release:

> Revising full year 2010 financial guidance, the Company anticipates pro forma combined annual revenues of $188 million to $193 million, $21 million to $24 million in pro forma combined adjusted EBITDA and positive non-GAAP EPS for the full year 2010, excluding acquisition-related expenses. The Company is issuing this guidance to reflect the 2010 pro forma combined effect on a 12-month basis, as if the Scient'x acquisition closed January 1, 2010. The revised annual pro forma revenue guidance reflects annual growth of 10% to 13% over pro forma 2009 revenues of $170.8 million.
>
> On a GAAP reporting basis, the Company expects full year 2010 consolidated revenues in the range of $177 million to $182 million, adjusted EBITDA to be in the range of $21 million to $24 million, and positive non-GAAP EPS, excluding acquisition-related expenses. The GAAP reporting basis guidance reflects the actual closing of the Scient'x acquisition at the end of March 2010 and the inclusion of Scient'x's actual operating results, effective April 1, 2010, into the Company's consolidated statement of operations and consolidated statement of cash flows. The GAAP reporting basis guidance also excludes IMC revenues of $3.1 million from first quarter 2010 as IMC was divested in the second quarter of 2010 and reported as discontinued operations.
>
> As previously announced, the Scient'x transaction closed on March 26, 2010. The Company has absorbed acquisition-related expenses that had a negative impact to GAAP EPS in the first and second quarters of 2010 and expects to absorb additional acquisition-related expenses in the third and fourth quarters of 2010.

71.     In response to the Company's August 5, 2010 announcements, Alphatec shares immediately dropped 46%, or $2.03, to $2.39, on volume of 13.18 million shares. Thus, Alphatec

shares were suddenly worth approximately half the price at which HealthpointCapital dumped its shares in the April 2010 Offering.

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

72.     Plaintiff is a shareholder of Nominal Defendant Alphatec, was a shareholder of Alphatec at the time of the wrongdoing alleged herein, and has been a shareholder of Alphatec continuously since that time.

73.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

74.     Plaintiff did not make a pre-suit demand on the Board, because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, as set forth below.

75.     At the time when the illicit misconduct and breaches of fiduciary occurred, and through the present date, the Company's Board consisted of defendants Berkowitz, Foster, Molson, O'Neil, Hochschuler, Glynn, Desai, Kuyper, and Marshall.  As a result of the facts set forth in this Complaint, demand on the Board is excused because a majority of the Board (defendants Berkowitz, Foster, Molson, O'Neil, and Hochschuler) is affiliated with HealthpointCapital, the Company's controlling shareholder, and is directly interested in the transactions complained of herein, including the Scient'x Acquisition and subsequent April 2010 Offering of Alphatec common stock.

76.     The Acquisition is not protected by the business judgment rule, but rather must be evaluated pursuant to the entire fairness standard, which, for the reasons discussed herein, defendants cannot meet.  Furthermore, the entire Board approved and disseminated the false Proxy Statements, which is likewise not protected by the business judgment rule and subjects all of the directors to a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and violating §14(a).

77.     In addition, defendants Berkowitz, Foster, Molson, O'Neil, and Hochschuler are directly interested in, and face a substantial likelihood of liability for, their use of their knowledge of material non-public information about the Company and its financial performance and prospects

to sell 9.2 million of HealthpointCapital's shares of Alphatec stock in the April 2010 Offering, which is a breach of their fiduciary duties of loyalty and good faith and is not protected by the business judgment rule.

78.     As well, defendant Kuyper is not independent because the Company's two Compensation Committee members (defendants O'Neil and Molson), who are directly interested in the transactions complained of herein, control his compensation as Alphatec's CEO, which, according to the Company's Proxy Statements, amounted to a total of $871,444 in 2009.

**COUNT I**

**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH FOR ENGAGING IN THE SCIENT'X ACQUISITION ON UNFAIR TERMS AND PURSUANT TO AN UNFAIR PRICE**

79.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

80.     As alleged in detail herein, each of the Individual Defendants, by reason of their positions as fiduciaries of the Company, owed to the Company the duties of undivided loyalty and good faith, and had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

81.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by engaging and approving of the Scient'x Acquisition on unfair terms and pursuant to an unfair price, as complained of herein, acts which were not, and could not have been, exercises of good faith business judgment. Rather, such acts were intended to, and did, unduly benefit Defendant HealthpointCapital, and the HealthpointCapital-affiliated directors and parties, at the expense of the Company, and were not entirely fair to the Company.

82.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained substantial damages, including, but not limited to, the overpayment for, and the costs and expenses incurred in connection with, the Acquisition.

## COUNT II

**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH FOR DISSEMINATING FALSE AND MISLEADING INFORMATION VIA PROJECTIONS AND PROXY STATEMENTS**

83.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

84.     The Individual Defendants, by reason of their positions as fiduciaries of the Company, owed to the Company the duties of undivided loyalty, good faith, and truthful disclosure, and had a duty to act in the best interest of the Company's shareholders and to disclose to the shareholders accurate and truthful information, as well as all material facts concerning the nature of the Scient'x Acquisition.

85.     As alleged herein, the Individual Defendants breached their fiduciary duties of loyalty and good faith by knowingly causing the Company to disseminate false and misleading information via the Company's Projections and Proxy Statements, as alleged herein.

86.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties associated with their dissemination of false and misleading information via the Company's Projections and Proxy Statements, the Company has sustained substantial damages, as alleged herein.

## COUNT III

**AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 14(a) FOR DISSEMINATING FALSE AND MISLEADING  PROXY STATEMENTS**

87.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

88.     Rule 14-A-9, promulgated pursuant to §14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14-A-9.

89.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Alphatec, were able to and did, directly and/or indirectly, exercise control over the contents of the Proxy Statements filed and disseminated by the Company.

90.     The Proxy Statements described herein violated §14(a) and Rule 14-A-9 because they contained false and misleading statements regarding the propriety of the Scient'x Acquisition, as alleged herein, and omitted material information necessary in order to make the statements therein not false or misleading, *e.g.*, that the Scient'x Acquisition was not in the best interests of the Company and that the terms of the Acquisition were unfair, as described herein.

91.     The Individual Defendants knew that the Proxy Statements were materially false and misleading, as alleged herein.

92.     The misrepresentations and omissions in the Proxy Statements were material, and were an essential link in the shareholder approval of the Scient'x Acquisition, as alleged herein.

93.     As a direct and proximate result of the foregoing violations of §14(a) and Rule 14-A-9, the Company has sustained substantial damages, as alleged herein.

## COUNT IV

### AGAINST DEFENDANTS BERKOWITZ, FOSTER, MOLSON, O'NEIL AND HOCHSCHULER FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH FOR SELLING STOCK BASED ON KNOWLEDGE OF MATERIAL NON-PUBLIC INFORMATION

94.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

95.     At the time of April 2010 Offering, defendants Berkowitz, Foster, Molson, O'Neil and Hochschuler knew, but did not disclose to the public, material non-public information regarding the Company's and Scient'x's financial condition and prospects, as alleged herein, and these defendants, through HealthpointCapital, made the stock sale described herein on the basis of and because of their knowledge of that material non-public information, which was a breach of their fiduciary duties of loyalty and good faith.

96. At the time of the April 2010 Offering, defendants Berkowitz, Foster, Molson, O'Neil and Hochschuler knew that when the truth regarding the Company's financial condition and prospects was disclosed the price of the Company's common stock would fall dramatically.

97. As a result of defendants Berkowitz, Foster, Molson, O'Neil and Hochschuler's foregoing breaches of fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds that they and/or HealthpointCapital obtained thereby.

## COUNT V

### AGAINST THE HEALTHPOINTCAPITAL DEFENDANTS FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES

98. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99. The Individual Defendants have a fiduciary relationship with Alphatec, and the HealthpointCapital Defendants knew that defendants Berkowitz, Foster, Molson, O'Neil and Hochschuler were breaching their fiduciary duty to Alphatec by disseminating false and misleading information via the Company's Projections and Proxy Statements, approving the Scient'x Acquisition, and selling Company stock through HealthpointCapital on the basis of and because of their knowledge of material non-public information, as alleged herein.

100. The HealthpointCapital Defendants materially assisted defendants Berkowitz, Foster, Molson, O'Neil and Hochschuler in breaching their fiduciary duties by permitting them to use their knowledge of material non-public information to sell Company stock through HealthpointCapital, as alleged herein.

101. As a result of defendants Berkowitz, Foster, Molson, O'Neil and Hochschuler's breaches of fiduciary duties, aided and abetted by Healthpoint Capital, the Company is entitled to the imposition of a constructive trust on any proceeds that they and/or HealthpointCapital obtained thereby.

## COUNT VI

### AGAINST THE HEALTHPOINTCAPITAL DEFENDANTS FOR UNJUST ENRICHMENT

102.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.    The HealthpointCapital Defendants were unjustly enriched by their receipt of proceeds from the illegal sale of Alphatec common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

104.    To remedy the HealthpointCapital Defendants' unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from the illegal sale of Alphatec common stock, as alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all defendants and in favor of the Company for the amount of damages sustained by the Company as a result of their misconduct;

B.    Imposing for the benefit of the Company a constructive trust any and all proceeds that defendants Berkowitz, Foster, Molson, O'Neil and Hochschuler and/or HealthpointCapital obtained as a result of the sale of Alphatec common stock in the April 2010 Offering;

C.    Ordering the HealthpointCapital Defendants to disgorge to the Company any and all of the proceeds they obtained as a result of the sale of Alphatec common stock in the April 2010 Offering;

D.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury

DATED:   December 2, 2010          Respectfully submitted,

/s/ Eric L. Zagar
BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Eric L. Zagar
Louis E. Moya
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (267) 948-2512

-and-

Ramzi Abadou
Erik D. Peterson
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Fax: (415) 400-3001

*Attorneys for Plaintiff*

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Marchell Norris, Derivatively on Behalf of Alphatec Holdings, Inc.

## DEFENDANTS
See Exhibit A

**(b)** County of Residence of First Listed Plaintiff   Lake County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Barroway Topaz Kessler Meltzer and Check, LLP, 280 King of Prussia Road, Radnor, PA 19087, 610-667-7706

Attorneys (If Known)

**'10CV2477 LAB POR**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | ☐ 710 Fair Labor Standards Act | ☐ 810 Selective Service |
| ☒ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332(a)(2)
Brief description of cause:
Breach of Fiduciary Duty

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  Roger Benitez
DOCKET NUMBER  3:10cv1673

DATE
12/02/2010

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

EXHIBIT "A" TO CIVIL COVER SHEET

MORTIMER BERKOWITZ, III, JOHN H. FOSTER, R. IAN MOLSON, STEPHEN E. O'NEIL, STEPHEN H. HOCHSCHULER, JAMES R. GLYNN, ROHIT M. DESAI, DIRK KUYPER, SIRI S. MARSHALL, PETER C. WULFF, HEALTHPOINTCAPITAL, LLC, HEALTHPOINTCAPITAL PARTNERS, LP, and HEALTHPOINTCAPITAL PARTNERS II, LP